J-S04044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHN HART | : | |
| | : | |
| Appellant | : | No. 2535 EDA 2019 |

Appeal from the PCRA Order Entered July 25, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0001012-2005

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHN HART | : | |
| | : | |
| Appellant | : | No. 2536 EDA 2019 |

Appeal from the PCRA Order Entered July 25, 2019
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0004329-2005

BEFORE:  BENDER, P.J.E., STABILE, J., and MURRAY, J.

MEMORANDUM PER CURIAM:                   **FILED MARCH 11, 2020**

John Hart (Appellant) appeals *pro se* from the order dismissing his second petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

It is undisputed that Appellant's petition, filed November 17, 2017, is untimely.[1]  However, this case is before us following remand for the PCRA court to "act as factfinder to determine whether [Appellant] has met the proof requirement under section 9545(b)(1)(ii)," *i.e.*, whether the [evidence was] in fact unknown to [Appellant] and whether he exercised due diligence . . ." *Commonwealth v. Hart*, 199 A.3d 475, 482 (Pa. Super. 2018).

> We previously summarized:
>
> On June 27, 2006, [Appellant] pled guilty to intimidation of witnesses or victims for his act of soliciting [a fellow inmate, Michael] Keenan[,] to kill his girlfriend.  The same day he also pled guilty to simple assault and stalking for separate crimes unrelated to the [solicitation].  [Appellant] did not file a direct appeal.  In October 2010, [he] filed his first *pro se* PCRA petition.  The PCRA court appointed counsel, who filed an amended petition.  The PCRA court denied the petition, and this Court affirmed.  *See Commonwealth v. Hart*, 63 A.3d 817 (Pa. Super. 2012) (unpublished memorandum).
>
> On November 17, 2017, PCRA counsel filed the instant petition giving rise to this appeal. The petition alleged that appellate counsel had uncovered in the DA's files four letters from Keenan to Detective Worrilow while the charges in reference to the [solicitation] were pending against [Appellant] . . .

*Id.* at 479.

---

[1] This Court previously determined that Appellant's judgment of sentence became final on July 27, 2006, and any petition filed after July 27, 2007 would be untimely in the absence of a statutory exception.  *Commonwealth v. Hart*, 199 A.3d 475, 481 (Pa. Super. 2018).

It is well-settled that in reviewing the denial of a PCRA petition, our review is limited to examining whether the PCRA court's findings are supported by the record and free of legal error. ***See Commonwealth v. Hanible***, 30 A.3d 426, 438 (Pa. 2011). We view the findings of the PCRA court and the evidence of record in the light most favorable to the prevailing party. ***Id.*** "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." ***See Commonwealth v. Mason***, 130 A.3d 601, 617 (Pa. 2015).

Further, Pennsylvania law is unequivocal that no court has jurisdiction to hear an untimely PCRA petition. ***Commonwealth v. Monaco***, 996 A.2d 1076, 1079 (Pa. Super. 2010) (quoting ***Commonwealth v. Robinson***, 837 A.2d 1157, 1161 (Pa. 2003)). A petitioner must file a PCRA petition within one year of the date on which the petitioner's judgment of sentence became final, unless one of the three statutory exceptions applies:

> (i)     the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii)    the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>
> (iii)   the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period

> provided in this section and has been held by that court
> to apply retroactively.

42 Pa.C.S.A. § 9545(b)(1). A petitioner must file a petition invoking one of these exceptions within one year of the date the claim could have been presented. 42 Pa.C.S.A. § 9545(b)(2).[2] If a petition is untimely, and the petitioner has not pled and proven any exception, "neither this Court nor the trial court has jurisdiction over the petition. Without jurisdiction, we simply do not have the legal authority to address the substantive claims." *Commonwealth v. Derrickson*, 923 A.2d 466, 468 (Pa. Super. 2007) (quoting *Commonwealth v. Chester*, 895 A.2d 520, 522 (Pa. 2006)). Instantly, we are without jurisdiction to decide Appellant's appeal unless he pled and proved one of the three timeliness exceptions of Section 9545(b)(1). *See Derrickson*, 923 A.2d at 468.

Following remand, the PCRA court concluded that Appellant's petition was untimely and did not meet an exception to the statutory time-bar because "at the time he entered his plea, Appellant was fully cognizant of the very information he now claims would have caused him to reject the plea offer, and

---

[2] Act 146 of 2018 amended 42 Pa.C.S.A. § 9545(b)(2), effective December 2018, now provides that a PCRA petition invoking a timeliness exception must be filed within one year of the date the claim could have been presented. Previously, a petitioner had 60 days from when the claim could have been presented. *See* Act 2018, Oct. 24, P.L. 894, No. 146, § 2 and § 3. Section 3 of Act 2018 provides that the amendment to subsection (b)(2) "shall apply only to claims arising one year before the effective date . . . or thereafter." *Id.* Here, it is not disputed that Appellant raised his PCRA claim "within 60 days of the date on which he could have first raised it." *Commonwealth v. Hart*, 199 A.3d at 481.

at all times Appellant failed to exercise due diligence." PCRA Court Opinion, 10/17/19, at 23.

In challenging the PCRA court's ruling, Appellant presents related issues:

> A. DID THE PCRA COURT NOT ERR IN DISMISSING APPELLANT'S POST CONVICTION RELIEF ACT PETITION WHERE IT IS UNDISPUTED THAT THE COMMONWEALTH FAILED TO PRODUCE BRADY MATERIAL IN THE FORM OF AT LEAST ONE LETTER IN WHICH THE MAIN WITNESS AGAINST APPELLANT INDICATED THAT THE ASSIGNED DETECTIVE HAD PROMISED THE WITNESS LENIENCY IN EXCHANGE FOR COOPERATION?
>
> B. DID THE PCRA COURT NOT ERR IN DISMISSING APPELLANT'S POST CONVICTION RELIEF ACT PETITION WHERE THE FOUR LETTERS WERE NOT MERELY CUMULATIVE OR DUPLICATIVE OF THE LETTERS PROVIDED TO THE DEFENSE DURING DISCOVERY?
>
> C. DID THE PCRA COURT NOT ERR IN DISMISSING APPELLANT'S POST CONVICTION RELIEF ACT PETITION WHERE APPELLANT EXERCISED DUE DILIGENCE TO OBTAIN THE FOUR LETTERS?
>
> D. DID THE PCRA COURT NOT ERR IN DISMISSING APPELLANT'S POST CONVICTION RELIEF ACT PETITION WHERE PLEA COUNSEL WOULD HAVE BEEN INEFFECTIVE FOR NOT DISCOVERING THE LETTERS OR DISCLOSING THEM TO APPELLANT IF ATTORNEY MUCH DID NOT EXERCISE DUE DILIGENCE TO OBTAIN THE FOUR LETTERS?
>
> E. DID THE PCRA COURT NOT ERR IN DISMISSING APPELLANT'S POST CONVICTION RELIEF ACT PETITION WHERE THE COURT'S DETERMINATION WAS NOT SUPPORTED BY EVIDENCE OF RECORD AND WHERE THE PCRA COURT SHOWED A PERSONAL BIAS AGAINST APPELLANT IN ITS OPINION?

Appellant's Brief at iv.

All of Appellant's issues concern the four letters written by Appellant's fellow inmate, Keenan, to Detective Worrilow. The PCRA court summarized:

> The Petition, facially untimely, raised the after discovered evidence exception, supported by the argument that the four letters written by Keenan to Detective Worrilow were not turned over during discovery, and, as such, his decision to enter the plea could not have been knowing, voluntarily and intelligent. The Petition also alleged claims of ineffective assistance of counsel and **Brady** violations. The general overview of all four letters, which were attached to the Petition, indicate that Keenan wanted/was expecting consideration on behalf of the District Attorney's office in his pending cases in exchange for his cooperation with Detective Worrilow in regard to Appellant's case.

PCRA Court Opinion, 10/17/19, at 8.

The PCRA court, after chronicling "Appellant's excessive filings, both *pro se* and counseled, [which] make the docket somewhat complex to follow," recounted the evidence presented at the PCRA hearing following remand, including Keenan's four letters. **See id.** at 1, 10-16. Notably, the district attorney testified that he "always gave" Appellant's attorney "everything he had in this case." **Id.** at 14. A transcript from the March 6, 2006 pre-trial hearing indicated that the district attorney stated "several times that all correspondence written from Keenan to Detective Worrilow regarding this case . . . had been turned over." **Id.** at 15 (citing N.T., 4/17/19, at 101).

The PCRA stated that it denied relief "after an exhaustive review of the transcripts from the January 10, 2006 discovery hearing, the transcripts from the March 2, 2006 discovery hearing, the transcripts from the March 17, 2006 discovery hearing, the transcripts from the April 17, 2006 discovery hearing, the exhibits, the contents of the letters in question, [and] the applicable caselaw." **Id.** at 16. The court found Appellant's trial counsel and the district attorney to be credible; it found "in contrast, Appellant's testimony was

entirely self-serving, well-rehearsed and, unlike [trial counsel and the district attorney], totally inconsistent with the fact that discovery in this matter transpired fifteen years ago." *Id.* at 21.

Further, the PCRA court observed:

> All these letters set forth the same facts, i.e., that Keenan was expecting (whether he was promised it or not) something in exchange for his cooperation. If Appellant's objective, as implied herein, was to use this information to cross-examine Keenan and undermine his credibility, Appellant had that information at the time he knowingly, intelligently and voluntarily entered his plea agreement.

PCRA Court Opinion, 10/17/19, at 21.

Upon review, we find no error in the factual findings and legal conclusions upon which the PCRA court relied in denying relief. As indicated above, the Honorable John P. Capuzzi, Sr., sitting as the PCRA court, has authored an excellent opinion explaining the court's decision. We therefore adopt and incorporate the entirety of Judge Capuzzi's opinion as our own in disposing of this case. When relevant, the parties shall attach a copy of the October 17, 2019 opinion to future pleadings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/20

- 7 -

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

| COMMONWEALTH OF PENNSYLVANIA | CP-23-CR-4329-2005 & 1012-2005 |
|---|---|
| v. | |
| John Hart | |

John F. X. Reilly, Esquire, for the Commonwealth
Conor Wilson, Esquire, for the Appellant

O P I N I O N

Capuzzi, J.

Filed: 10\17\19

This is an appeal from this Court's denial of Appellant's second request for Post-Conviction Relief pursuant to the Post-Conviction Relief Act.[1] Forth the forthcoming reasons, the denial of the requested relief should be affirmed on appeal.

**PROCEDURAL HISTORY**

The following is a recitation of the procedural history for both #4329-2005 and #1012-2005. Appellant's excessive filings, both *pro se* and counseled, make the docket somewhat complex to follow; however, this Court has set forth the procedural history as precisely as possible. In addition, this Court notes that the procedural history, as well as a thorough reading of the transcripts from past hearings, is absolutely germane to the credibility determinations that this Court was required to make at the PCRA hearing.

On December 9, 2004, Appellant was arrested and charged with Harassment, Stalking, and related offenses, the victim in the case being his ex-girlfriend. This case is docketed as #4329-

---

[1] 42 Pa.C.S.A. § 9543

2005. During the time that Appellant was incarcerated at George W. Hill Correctional Facility (hereinafter GWHCF) on the aforementioned charges, his cellmate was a man by the name of Michael Keenan (hereinafter Keenan).[2]

Keenan and Appellant became friendly. One evening, Appellant and Keenan were sitting around, and Appellant told Keenan that he wanted to have his girlfriend disappear. Appellant acted like he was joking at the time. However, Appellant came back to Keenan later and seriously asked if Keenan knew someone on the outside who could make his girlfriend disappear. Appellant repeatedly asked Keenan about it every day for approximately two weeks. Keenan played along with Appellant at first; Appellant gave Keenan his girlfriend's name and address.[3]

In February of 2005, afraid that Appellant was actually going to bring harm to his girlfriend, Keenan informed the District Attorney's office via letter that Appellant had repeatedly been asking him to have someone kill his girlfriend. Detective Thomas Worrilow, Jr., of the Criminal Investigative Division of the Delaware County District Attorney's Office, was assigned to investigate the allegations. As a result of his investigation, solicitation charges were ultimately filed against Appellant, docketed as #1012-2005. During the pre-trial phase of litigation and through his eventual plea, Appellant was represented by Attorney Mark P. Much, Esquire, on both docket numbers. The prosecution of both cases was originally assigned to Andrew Rongus; but, was re-assigned to Deputy District Attorney, Michael Galantino, Esquire, shortly thereafter as Attorney Rongus had left the District Attorney's Office.

---

[2] Keenan was arrested and charged on transcript number 845-2005 and 548-2005. Keenan entered into open guilty pleas on June 22, 2005 to Criminal Attempt and Acquisition of a Controlled Substance by Fraud (UF) and False Identification to Law Enforcement (M3). Keenan was sentenced on July 25, 2006. Those cases were prosecuted by then Assistant District Attorney, Katayoun Copeland, Esquire (now District Attorney Katayoun Copeland).
[3] [N.T., 3/17/2006 p. 5-15].

In relation to the issue at hand, several pre-trial hearings were held in front of the Honorable Barry C. Dozor. The first on January 10, 2006, the second on March 2, 2006, and the third on March 17, 2006. The hearings were not solely discovery-based hearings, but the status of discovery was addressed at all three. Attorney Much, DDA Galantino, and Appellant were present at all three hearings.

At the first hearing, on January 10, 2006, the Court set a discovery schedule for any item that had not already been turned over to Attorney Much. The transcripts from the hearing indicate that Attorney Much received a packet of discovery from DDA Galantino the previous day, January 9, 2006. To codify what he had received, Attorney Much wrote a letter detailing everything that had been turned over to him by DDA Galantino. This Court notes that, at the hearing, Attorney Much stated that he has not received anything in the way of discovery on Keenan; however, his letter details that he had, including a letter authored by Keenan. [N.T., 1/10/2006 p. 10]. Attorney Much also notes on the record that he was handed a letter written by Keenan to ADA Jay Matera in Court that afternoon, [N.T., 1/10/ 2006 p. 15]. This Court also notes that the focus seemed to be primarily on Keenan's involvement in the prosecution of other cases and not really with the communications between Keenan and Detective Worrilow in regard to this case. [N.T., 1/10/2006 p. 10].

At the second hearing, on March 2, 2006, Attorney Much and DDA Galantino specifically addressed any correspondence between Keenan and the DA's Office in regard to the cases with Appellant and also the unrelated cases in which Keenan cooperated as a witness. DDA Galantino specifically told the Court that there were no written agreements between Keenan and the DA's Office in exchange for his cooperation; rather, Keenan was told that the ADA handling his cases would advise the sentencing Judge as to the extent of his cooperation, but his cooperation would

not result in any specific sentence. [N.T., 3/2/2006 p. 9-19]. Attorney Much was not satisfied with that representation and requested another continuance on his motion to suppress oral and written statements in order to subpoena the ADA's who had handled cases in which Keenan had been a participant in the past. [N.T., 3/2/2006 p. 24]. Most notably, the transcripts show Appellant continually interrupting the Court and his attorney, arguing that he was not personally ready to proceed to trial because no discovery has been turned over; which is blatantly false as, as at very least, discovery was turned over on January 10, 2006 as detailed in Attorney Much's letter, as well as Attorney Much's statement that he received Keenan's letter to ADA Mattera.

On March 17, 2006, a third hearing was held. At this hearing, the Court took testimony on Appellant's Motion to Preclude Keenan's testimony and the motion to suppress oral and written statements made by Keenan. [N.T., 3/17/2006 p 7.]. At the hearing, Keenan testified that after Appellant continually asked him if he had anyone on the outside to kill his girlfriend, he wrote a letter to the DA's Office. [N.T., 3/17/2006 p. 14]. Keenan testified that he wrote the letter because he was "scared for the girl." [N.T., 3/17/2016 p. 20]. Keenan testified that after he wrote the letter, he was contacted by Detective Worrilow, who told him to "keep his ears open" and he provided him with a phone number to contact him, which he did. [N.T., 3/17/2006 p. 28].Keenan further testified that he wasn't looking for any help on his cases, that he was really spooked by the way Appellant was talking. [N.T., 3/17/2006 p. 41]. Detective Worrilow also testified at the hearing that he spoke with Keenan after he received the letter and just told Keenan to keep stringing Appellant along and keep his ears open. [N.T., 3/17/2006 p. 50]. Detective Worrilow testified that he never made any promises to Appellant as to what he would receive in return for the information he provided. [N.T., 3/17/2006 p. 52]. Attorney Much also explained that he spoke with the ADA's

who had used Keenan in other cases and that he no longer felt the need to subpoena them to testify as to Keenan's involvement. [N.T., 3/17/2006 p. 106].

Ultimately, Appellant entered a knowing, voluntarily, and intelligent negotiated plea on both transcripts on June 27, 2006. Appellant filed a *pro se* Motion to Modify Sentence, which was denied. No direct appeal was filed.

On February 13, 2008, a bench warrant was issued as a result of Appellant's violation of probation on the aforementioned cases. Notably, the violations concerned alleged charges of stalking and harassment filed by an alleged victim in Hilltown, Bucks County. A second violation also occurred as a result of Appellant's new summary conviction for harassment in Radnor, a factual scenario wherein Appellant obtained the victim's cellular phone number from a resume she submitted to Appellant's place of work. [N.T., 3/20/2008 p. 9-35]. Appellant hired Scott Kramer, Esquire, who filed a Motion for Habeas Corpus to Lift Detainer. On March 20, 2008, a hearing was held in front of Judge Dozor. The detainer was lifted.

In September of 2008, Appellant filed a *pro se* Emergency Petition to Correct Sentence and a *pro se* Motion to Amend Costs. Both Motions were denied on October 16, 2008.

On April 4, 2009 (before the *Gagnon II* hearing on the first violation was held) another bench warrant probation violation was issued because, on April 2, 2009, an arrest warrant was issued for Appellant by the Cherry Hill,(NJ) Police Department charging Appellant with simple assault and harassment. On August 9, 2019, Appellant filed another *pro se* Petition to Lift Detainer as well as a Petition for Credit Time. The Motions were denied.

On August 5, 2009, Attorney Kramer filed a Petition to Withdraw citing irreconcilable differences as Appellant continually refused to accept his advice as counsel . That Motion was

granted the following day on August 6, 2009, and the Office of the Public Defender was appointed to represent Appellant in the upcoming *Gagnon II* hearing scheduled for August 12, 2009. [4]

On August 10, 2009, Appellant filed a *pro se* Petition to Recuse DDA Galantino.

The *Gagnon II* hearing was conducted on August 12, 2009. The Court denied the Motion to Recuse DDA Galantino. Furthermore, Appellant was found to be in violation of his probation. On docket #4329-2005, Appellant was sentenced to two years of probation consecutive to his probation on #1012-2005. Appellant was furthered ordered to have no contact with the victims and ordered to comply with PFA orders in both PA and NJ.

On August 11, 2010, Appellant filed his first *pro se* PCRA Petition. In addition, Petitioner also filed a Motion to Recuse Judge Dozor from presiding over the PCRA Petition alleging a litany of allegations against the trial court. The Court granted the Motion with the following recitation: " *This Court, at all times, has been a neutral and detached jurist while presiding over any motions, petitions, Gagnon II hearings, pleas, PCRA Hearings or pleas that involved the above-named Defendant; however, in light of the Motion filed by the pro se Defendant, this Court is constrained to recuse itself from Mr. Hart's cases and as such the cases will be assigned to another Judge.* " [5] *(italics added).*

The case was re-assigned to the Honorable James P. Bradley. Appellant filed a *pro se* amended PCRA Petition on October 12, 2010. PCRA Counsel, Scott Galloway, Esquire, was appointed to assist Appellant. A hearing was scheduled on the PCRA Petition. On November 1, 2010, the Court issued an Order stating that Appellant was adamant in representing himself and

---

[4] Appellant filed a *pro se* Emergency Petition to Set Bail with the Superior Court, which was denied on August 6, 2009.
[5] See Order Granting Defendant's Motion for Recusal, dated September 16, 2010, signed by Honorable Barry C. Dozor.

that Attorney Galloway was allowed to withdraw. [6] An Order dismissing the Petition was issued on January 23, 2012.

On February 1, 2012, Appellant filed a *pro se* Motion for Reconsideration of the PCRA Denial. Before the Court could decide the Motion, Appellant filed a *pro se* Notice of Appeal on February 15, 2012.

On March 9, 2012, Appellant then filed a *pro se* Emergency Petition for Stay of Sentence and Bail pending PCRA Determination, which the Court denied. The PCRA Court authored its 1925(a) Opinion on June 21, 2012.

On January 9, 2013, yet another bench warrant was issued. Appellant hired Traci Burns, Esquire. Attorney Burns filed a Petition to Lift Detainer. A hearing was held on October 16, 2013, wherein counsel withdrew the Petition. On November 23, 2016, counsel re-filed the Motion. A hearing was held on December 31, 2013 and the Motion was denied January 15, 2014.

Appellant filed a *pro se* Notice of Appeal on February 18, 2014. Attorney Burns filed a Praecipe to Withdraw her appearance on February 18, 2014. The appeal was quashed by the Superior Court on April 1, 2016.

On August 4, 2014, Elizabeth Curran McDonald, Esquire, entered her appearance on behalf of Appellant. Appellant filed a Motion for Recusal demanding that Judge Bradley recuse himself. Judge Bradley granted the Motion September 21, 2016.

On October 20, 2016, a *Gagnon II* hearing was held in front of this Court. Appellant was found to be in violation of his probation and sentenced to two years of probation consecutive to a Philadelphia matter docketed as #4175-2012. On June 28, 2017, Appellant filed a Motion for Reconsideration *Nunc Pro Tunc*, which was denied on July 10, 2017.

---

[6] See Order signed November 1, 2011, by Honorable Judge James P. Bradley.

In 2017, Appellant gained access to the Delaware County Office of the District Attorney's files in relation to a pending unrelated civil matter in Philadelphia.[7] Located within the files were four letters written by Keenan to Detective Worrilow, letters which Appellant asserts that he never saw prior to his decision to enter into a plea agreement on #4329-2005 and #1012-2005.

Appellant retained the services of Conor Wilson, Esquire. Attorney Wilson filed a PCRA Petition on November 17, 2018, which is the underlying subject of this appeal. The Petition, facially untimely, raised the after discovered evidence exception, supported by the argument that the four letters written by Keenan to Detective Worrilow were not turned over during discovery, and, as such, his decision to enter the plea could not have been knowing, voluntary and intelligent. The Petition also alleged claims of ineffective assistance of counsel and *Brady* violations. The general overview of all four letters, which were attached as exhibits to the Petition, indicate that Keenan wanted/was expecting consideration on behalf of the District Attorney's office in his pending cases in exchange for his cooperation with Detective Worrilow in regard to Appellant's case. Appellant argues that, had he seen the letters, he would have insisted on going to trial on both docket numbers, as he is innocent and could have attacked Keenan's credibility due to the alleged promises made by the DA's Office in exchange for his cooperation.

The Commonwealth filed a timely Response to Petitioner's PCRA Petition on December 8, 2017. Counsel for Appellant requested time in which to file a Response, which this Court allowed, and which counsel for Appellant timely filed on December 22, 2017.

After review, this Court issued a Notice of Intent to Dismiss Without a Hearing on January 22, 2018. The Petition was ultimately dismissed via Order on February 28, 2018; Appellant appealed. The Superior Court issued an Opinion on January 4, 2019, which remanded the matter,

---

[7] Hart v. Philadelphia News Network

instructing this Court to conduct an evidentiary hearing, stating that a genuine issue of material fact existed in regard to Appellant's reliance on the after discovered evidence exception to the timeliness requirement. **Specifically, the Superior Court held that there was a genuine issue as to whether or not (1) the letters were unknown to Appellant and (2) whether or not Appellant exercised due diligence in obtaining them. This Court was instructed to decide the issues on remand in order to determine if Appellant satisfied the "proof requirement" of the newly discovered evidence exception to the timeliness requirement, and had the requirements been satisfied, whether the issues raised in the Petition, namely alleged ineffective of counsel and *Brady* violations, had merit. (emphasis added).** [8]

In the interim, on December 10, 2018, Delaware County issued another bench warrant for a violation of probation against Appellant. The violation was a result of stalking and harassment charges being filed against Appellant in Camden County, NJ.

This Court had originally scheduled the hearing for January 17, 2019; however, Appellant did not appear for the hearing, so this Court was forced to continue the matter. On February 1, 2019, Haverford Township arrested Appellant on the December 10th bench warrant. Appellant was detained at GWHCF. Appellant retained the services of Zak Goldstein, Esquire, who filed a Motion to Lift the Detainer so Appellant could appear in New Jersey to resolve the matter. On February 14, 2019, this Court denied that Motion, stating that a PCRA hearing had been scheduled and that it was absolutely necessary that Appellant be in Delaware County for that hearing. Despite that, the detainer against Appellant was lifted at a *Gagnon I* Hearing (not conducted by this Court) later that day. The PCRA hearing was re-scheduled, yet again, for April 17, 2019.

---

[8] *Commonwealth v. Hart*, 199 A.3d 475 (Pa. Super. 2018).

## THE PCRA EVIDENTIARY HEARING

On April 17, 2019, testimony was taken from Appellant; Appellant's trial counsel, Mr. Mark Much, Esquire; Deputy District Attorney Michael Galantino, Esquire; and CID Detective, Thomas Worrilow.

*The letters that are the subject of this Petition were marked as DPCRA-3, DPCRA-4, DPCRA-5, and DPCRA-6.*

- DPCR- 3: Letter from Michael Keenan to Detective Worrilow dated January 10, 2006;
- DPCRA-4: Three-page Letter from Michael Keenan to Detective Worrilow, with attached envelope stamped July 13, 2005.
- DPCRA-5: One-page letter from Michael Keenan to Detective Worrilow; undated (with the exception of saying Tuesday).
- DPCRA-6: Two-page letter from Michael Keenan to Detective Worrilow, dated October 9, 2005.

Attorney Much testified that he represented Appellant on both docket numbers. [N.T., 4/17/2019 p. 10]. On August 10, 2005, Attorney Much filed an omnibus pretrial motion, which included a motion for discovery.[9] Included within the motion was a request for a copy of all written statements, a copy of all tape-recorded statements, and a substantially verbatim written report of all unrecorded oral statements given by Keenan. [N.T., 4/17/2019 p. 7].

On January 9, 2006, Attorney Much received discovery from the District Attorney's Office, which he memorialized in a letter dated January 10, 2006. In regard to Keenan, the letter details that the prior day, Attorney Much received "a sixteen-page typed statement given by Keenan on March 5, 2005, a four-page writing submitted to District Attorney by Keenan, a one-page writing prepared by Keenan with fingerprint analysis, and Keenan's criminal record." [N.T., 4/17/ 2019 p. 9].[10]

---

[9] The omnibus pretrial motion was marked as DPCRA-2.
[10] The discovery letter authored by Mr. Much was marked as DPCRA-1

Attorney Much testified that, on January 10, 2006, he appeared at a discovery hearing that was held in front of the Honorable Barry C. Dozor.[11] At that hearing, Attorney Much stated, on the record, that he was just handed another letter from the DDA Galantino, which was written by Keenan to a fellow ADA, Jay Matera.[12]

On March 17, 2006, Attorney Much appeared at another discovery hearing in front of Judge Dozor.[13] Attorney Much could not recall if he was in possession of the four letters at the time of the hearing but, as the notes of testimony do not reflect him asking questions about the letters to Keenan or Detective Worrilow, he concluded that he probably did not have them in his possession at that time. [N.T., 4/7/2019 p. 22].

In regard to the time period between March 17, 2006 and the negotiated plea on June 25, 2006, Attorney Much could not recall if he had received any of the letters in question but knows that he would have turned them over to Appellant, as was his regular practice when receiving discovery. Attorney Much also testified that Appellant was a very active participant and had a very vested interest in the matters. [N.T., 4/17/2019 p. 24-25].

On cross examination, Attorney Much agreed that it was possible that the mention of receiving a four-page writing from Keenan in his January 10, 2006, discovery letter (DPCRA-1) could be one of the letters in question, specifically DPCRA-4 because the attached envelope would make the document a total of 4 pages, but he could not say for certain whether that was the letter he was referencing or not. Attorney Much also agreed that on the day of the January 10, 2006, discovery hearing, he was handed a letter in court that was written by Keenan to ADA Jay Matera; the letter was telling ADA Matera that "he got in trouble again and that he had turned in a guy who

---

[11] The transcript of the proceeding is marked as DPCRA-7.
[12] The letter was marked as DPCRA-12; Attorney Matera was handling an unrelated homicide case (Commonwealth v. Jason Holmes) in which Keenan was a witness.
[13] The transcript of the proceeding is marked as DPCRA-8.

wanted to have his gf killed." [N.T., 4/17/2019 p. 29]. Attorney Much also agreed on cross that a discovery hearing would not have been the place to attack a witness's credibility or to expose any potential bias. [N.T., 4/17/2019 p. 31]. Attorney Much also agreed that by a few years into practicing in Delaware County, the District Attorney's Office had an open-door policy, and Attorney Much was always able to walk into the office and review the file. [N.T., 4/17/2019 p. 38].

Overall, Attorney Much testified that he did not recall ever seeing DPCRA-3 through DPCRA-6; however, as the discovery period in these cases occurred approximately fifteen years ago, he could not say for certain.

Appellant also testified at the PCRA hearing. Appellant testified that he hired Attorney Much to represent him on both dockets and that he hired him at the preliminary hearing stage of the proceedings. [N.T., 4/17/2019 p. 50]. From the time of his arrest until the resolution of both matters, Appellant was in prison and Attorney Much would come visit with him as well as Attorney Much's paralegal. [N.T., 4/17/2019 p. 51]. In regard to DPCRA-12 (the letter written by Keenan to ADA Matera) Appellant testified that he first saw that letter at the discovery hearing on March 17, 2006. [N.T., 4/17/2019 p. 52]. The letters marked DPCRA-9 and DPCRA-10, Appellant testified that also saw before entering into the plea agreement. [N.T., 4/17/2019 p. 54].

In regard to DPCRA-3, DPCRA-4, DPCRA-5, and DPCRA-6, Appellant testified that he never saw those letters prior to September 17, 2017, when he was reviewing the District Attorney's file for an unrelated civil lawsuit in Philadelphia County. [N.T., 4/17/2019 p. 53]. Had he seen the letters prior to entering the plea, Appellant testified that he would have insisted on going to trial in order to attack Keenan's credibility with the letters that indicate he was promised something in return for his testimony against Appellant. [N.T., 4/17/2019 p. 56].

Michael R. Galantino, Esquire, testified that in 2005, he was employed by the Delaware County District Attorney's Office as an Assistant District Attorney, particularly as Chief of the Special Victim's Unit; at some point that year, DDA Galantino was promoted to Deputy District Attorney but still assigned to SVU. [N.T., 4/17/2019 p. 60]. In regard to Appellant, DDA Galantino was assigned to handle both docket numbers, and, as the assigned prosecutor, one of his duties included discovery. [N.T., 4/17/2019 p. 61]. DDA

DDA Galantino testified that in general, his discovery process consisted of him personally going through a file and photocopying anything that would constitute discovery and either emailing copies to a defense attorney or hand delivering them. [N.T., 4/17/2019 p. 61]. Often times, DDA Galantino had occasion to see the defense attorneys in the courtroom so discovery was often personally handed over. [N.T., 4/17/2019 p. 61]. DDA Galantino recalled that Attorney Much was not the first attorney that Appellant had retained; rather, he believed that someone else was involved prior to the preliminary hearing. [N.T., 4/17/2019 p. 61]. However, as soon as Attorney Much entered his appearance, it would have been DDA Galantino's practice to provide him with all the discovery up to that point. [N.T., 4/17/2019 p. 63].

In relation to Keenan, DDA Galantino testified that Keenan was the first person to bring it to the attention of police that Appellant was trying to have Keenan arrange for a friend on the outside to kill his girlfriend, the victim in #4329-05. [N.T., 4/17/2019 p. 63]. DDA Galantino personally interviewed Keenan a few times, spoke with Keenan on the phone a few times, and testified that Keenan wrote letters throughout the course of the pre-trial phase and even sent a letter after Appellant had pled guilty. [N.T., 4/17/2019 p. 64]. The letters were specifically written to Detective Worrilow but Detective Worrilow would hand deliver the letters to DDA Galantino and DDA Galantino would provide copies to Attorney Much. [N.T., 4/17/2019 p. 64].

DDA Galantino was not the assigned ADA on Keenan's case; however, Keenan had pled guilty in 2005 but his sentencing was delayed, he suspects because his case with Appellant was still open and Keenan would need to be a witness if the case went to trial. [N.T., 4/17/2019 p. 66]. There did come a time when Keenan expressed frustration about this to DDA Galantino over the phone, stating that he "should have just kept his mouth shut." [N.T., 4/17/2019 p. 67].

In relation to DPCRA-5 (the undated later), DDA Galantino testified that he is positive that one of the letters from Keenan came in after Appellant took a plea, and by the tone of the letter, he believes it to be DPCRA-5. [N.T., 4/17/2019 p. 73].

DDA Galantino testified that, on March 2, 2006, a second discovery hearing was held and on March 17, 2006, a third discovery hearing was held; he attended both. [N.T., 4/17/2019 p. 78].

Overall, DDA Galantino did not have a specific recollection of when he turned over each specific letter; however, he knows that at least letters DPCRA-3, DPCRA-4, and DPCRA-6, the letters that he knows he received before Appellant's plea would have been turned over to Attorney Much on whatever day he received them. [N.T., 4/17/2019 p. 79]. In regard to the content, DDA Galantino testified that all four letters in question give away the same content, i.e., that Keenan was angry that he was still in prison despite providing information about Appellant's request. [N.T., 4/17/2019 p. 79].

On cross-examination, DDA Galantino testified that he does not recall what specific day he turned over each letter; in general, DDA Galantino recalls that he always gave Attorney Much everything that he had in this case. [N.T., 4/17/2019 p. 80]. DDA Galantino further testified that he struggled with remembering how many letters came in before Appellant's plea and how many came in after. [N.T., 4/17/2019 p. 83]. The letters all came to Detective Worrilow first and then Detective Worrilow would bring them to DDA Galantino's office, so the date on the letter would

mean that Detective Worrilow received the letter after that but then DDA Galantino did not see them until Detective Worrilow would deliver it to him. [N.T., 4/17/2019 p. 83]. As far as the January 10, 2006, letter from Attorney Much, DDA Galantino did not take the list of items provided to mean everything that had been provided thus far, it meant those were the discovery items provided to Attorney Much specifically the day prior, January 9, 2006, by DDA Galantino; not a complete list of all discovery provided. [N.T., 4/17/2019 p. 84]. Discovery had been turned over on other days prior to January 9, 2006, as well, including an initial discovery package that would have been turned over when Attorney Much entered his appearance. [N.T., 4/17/2019 p. 84].

DDA Galantino noted that in the transcript from March 2, 2006, he states on the record several times that all correspondence received from Keenan written to Detective Worrilow regarding this case or other defendants, had been turned over. [N.T., 4/17/2019 p. 101]. [14]

Detective Thomas Worrilow testified that he is currently employed as a teacher at Neumann University; however, prior to that he spent forty-five years in law enforcement. [N.T., 4/17/2019 p.124]. During the early 2000's, Detective Worrilow was employed by the Delaware County District Attorney's Office in the Special Investigations Unit. [N.T., 4/17/2019 p. 124]. In regard to Appellant, Detective Worrilow was the primary investigator assigned to investigate the allegations made by Keenan in regard to his statements about Appellant. [N.T., 4/17/2019 p. 125]. Detective Worrilow recalls hand delivering DPCRA-3 through DPCRA-6 to DDA Galantino. [N.T., 4/17/2019 p. 128]. Detective Worrilow also testified that he personally hand delivered DPCRA-12 (letter to Jay Matera) to DDA Galantino because Attorney Matera's Office was across

---

[14] The letter in reference to "other defendants" was the letter written to Jay Matera, as Attorney Matera was handling a homicide matter in which Keenan was a cooperating witness. [N.T., 4/17/2019 p. 105].

from Detective Worrilow's and Attorney Matera gave him the letter because he knew he was investigating the claims made by Keenan. [N.T., 4/17/2019 p. 133].

On cross examination, Detective Worrilow stated that he did not recall the exact date and time that he hand delivered the letters, as the case occurred fifteen years ago. [N.T., 4/17/2019 p. 135]. In addition, Detective Worrilow stated that he had numerous phone conversations with Keenan and had gone to see him in prison on a few occasions. [N.T., 4/17/2019 p. 135]. During those interactions, Detective Worrilow testified that he never promised Keenan that he would get him out of jail nor did he promise that he would speak on his behalf at his sentencing. [N.T., 4/17/2019 p. 138]. In one of the letters, Keenan references a 15-to 30-month deal, which was an offer on his case that was made before Appellant even talked to Keenan about killing his girlfriend. [N.T., 4/17/2019 p.1 38].

At the conclusion of the hearing, this Court gave the parties time to file briefs with the Court; both parties filed briefs within the allotted timeframe. After an exhaustive review of the transcripts from the January 10, 2006 discovery hearing, the transcripts from the March 2, 2006 discovery hearing, the transcripts from the March 17, 2006 discovery hearing, the transcripts from the April 17, 2006 PCRA hearing, the exhibits, the contents of the letters in question, the applicable caselaw, this Court denied Appellant's request for Post-Conviction relief via Order dated July 25, 2019. This appeal followed.

## DISCUSSION

**THIS COURT PROPERLY DISMISSED THE PETITION AS PETITIONER DID NOT MEET HIS EVIDENTIARY BURDEN OF PROVING THE ELEMENTS OF 42 Pa.C.S. 9545(b)(1)(ii).**

Appellant mischaracterizes the holding in the previous Superior Court opinion which remanded the matter. The Superior Court did not hold that Appellant proved the elements of the

after discovered evidence exception. Rather, the Court held that Appellant raised the issue enough that a "genuine issue of material fact" existed, i.e. whether Appellant knew of the letters and if not if he exercised due diligence in obtaining them. The Superior Court did not say the proof requirement was satisfied. Had the Court ruled that the exception to the timeliness requirement been satisfied, this Court would have been instructed to address the merits of the Petition, not hold a hearing on the after discovered evidence exception. Therefore, this Court will address the timelines of the Petition, which it concludes that Appellant has not satisfied.

At the very outset, it must be highlighted that Appellant self-represented as evidenced by this numerous filings. Of great import is the fact that Appellant filed his original PCRA Petition, as well as his Amended PCRA Petition, *pro se*. The PCRA court appointed Attorney Galloway to assist Appellant; yet, despite the help offered by the court, Appellant insisted on representing himself and Attorney Galloway was permitted to withdraw. Consequently, due diligence was required of Appellant at the commencement of his first PCRA Petition.

The standard of review from the denial of a PCRA petition "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Sandusky, 203 A.3d 1033 (Pa. Super. 2019).*

The Superior Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. A PCRA court's legal conclusions, however, are reviewed *de novo. Sandusky, 203 A.3d at 1043.* **The fact-finder is tasked with the responsibility of "resolving contradictory testimony and questions of credibility."** *Commonwealth v. Roane,* 204 A.3d 998, 1001 (Pa. Super. 2019)(emphasis added).

Generally, a PCRA petition must be filed within one year of the date the underlying judgment becomes final. A judgment becomes final for purposes of a PCRA, "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking review," *42 Pa.C.S. 9545 (b)(3)*.

The timeliness requirement has three general exceptions:

a)      failure to raise the claim was result of interference by government officials with the presentation of the claim in violation of the constitution or laws of Commonwealth or the constitution or laws of the US;

**b)      facts upon which the claim is predicated were unknown to petitioner and could not have been ascertained by exercise of due diligence;**

c)      right asserted is a constitutional right that was recognized by the Supreme Court or the Supreme Court of Pennsylvania after the time period provided and has been held by that court to apply retroactively. *42 Pa.C.S. 9545(b)(1)*.

The newly discovered facts exception relates to whether a court has jurisdiction to consider an untimely petition. A petitioner satisfies the newly discovered facts exception when the petitioner pleads and proves that "(1) the facts upon which the claim is predicated were unknown and (2) could not have been ascertained by the exercise of due diligence." *Commonwealth v. Stanton*, 184 A.2d 949 (Pa. 2018).

To qualify as a "new fact" the information may not be part of the public record. In addition, the item must not merely be a newly discovered or newly willing source for previously known facts." *Commonwealth v. Stanton*, 184 A.2d 949 (Pa. 2018). Due diligence "requires reasonable efforts by a petitioner, based on the particular circumstances, to uncover facts that may support a claim for collateral relief," but does not require "perfect vigilance [or] punctilious care. *Commonwealth v. Hart*, 2018 WL 6073715 (Pa. Super. 2018).

Determination of the credibility of a witness is within the exclusive province of the fact finder. *Commonwealth v. Izurieta*, 171 A.3d 802 (Pa. Super. 2017). "The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon references drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness. The phenomenon of lying, and situations in which prevarications might be expected to occur, have traditionally been regarded as within the ordinary facility of jurors to assess." *Commonwealth v. Crawford*, 553 Pa. 195, 203 (1998).

The question as to whether or not the facts upon which Appellant's claim is predicated were unknown to him relies heavily upon determinations of credibility, which are within the exclusive province of the PCRA Court as the fact finder.

In regard to Attorney Much, this Court finds that the testimony he provided at the PCRA hearing was credible. Despite what Appellant wishes to mischaracterize in his PCRA brief, Attorney Much never told this Court with certainty that he was not provided the four letters in question. Rather, Attorney Much told this Court that discovery occurred fifteen years ago, and he did not recall seeing the letters, but that he could not say that with certainty. Attorney Much agreed that there was a chance that one of the letters in question may be have the one of the letters that he referenced in his January 10, 2006, Discovery Letter. He also agreed that, had DPCRA-5 come in after the plea, he would not have received that in pre-trial discovery.

Attorney Much unequivocally agreed that the content of the four letters in question is substantially the same, that is, that Keenan was expecting something in return for his cooperation and possible testimony against the Appellant. Consequently, this is not a new fact nor was it an unknown fact at the time Appellant entered his plea. As the notes of testimony from the March 2,

2006 discovery hearing bear out, DDA Galantino informed this Court that there was no specific plea agreement made between the Office of the District Attorney and Keenan in relation to the sentence Keenan would receive. Of significant import, DDA Galantino further stated that Keenan was merely advised that his cooperation would be mentioned to the judge handling his matters at the time of his sentencing. Not surprisingly, the notes of testimony from Keenan's sentencing reflect just that. This lends further credence to DDA Galantino's testimony.

Attorney Much was keenly aware, at the pre-litigation phase, of the District Attorney's position vis-a-vis Keenan's cooperation and its sentencing posture as borne out by the above testimony and evidence. Likewise, Appellant, who was present at every pre-trial hearing was also acutely aware of the same, as the record demonstrates him interrupting both the Court and Attorney Much on several occasions.

The summation of Attorney Much's testimony is that he doesn't remember if he received the four letters in question as the matter occurred fifteen years prior but cannot state with certainty that he did not. However, his letter to DDA Galantino confirms that he had, at the minimum, one letter relating to Keenan. While this testimony of Attorney Much is credible, it does not persuade the Court that discoverable evidence was not produced by the Commonwealth.

This Court also finds the testimony of DDA Galantino to be credible. DDA Galantino advised the Court that he did not recall physically handing each specific letter over to Attorney Much, but it was his common practice for the multitude of years that he practiced as an ADA, to turn over discovery as he receives it and that there would have been no reason for him to deviate from his typical practice. He was candid and honest with the Court that he did not recall the exact date and time in which the letters were turned over. He was candid with this Court that he did not keep a list of discovery in this case, but he was adamant that whatever letters he received, he turned

over to the defense. In concert with, like Attorney Much's testimony, this Court does not find any problem with the fact that DDA Galantino could not remember every little detail, in fact, it lent credibility to the testimony of both of them. In addition, DDA Galantino discussed the open-door policy that he had with his casefiles, meaning that a defense attorney could stop in any virtually any time and review the file at his or her leisure.

In contrast, Appellant's testimony was entirely self-serving, well-rehearsed and, unlike Attorneys Galantino and Much, totally inconsistent with the fact that discovery in this matter transpired fifteen years ago. Despite this indisputable fact, Appellant was incredulously adamant that he absolutely remembered every minute detail. Common sense and the above transcripts eviscerate this outlandish assertion.

Appellant bears the burden to prove that the letters from Kennan were unknown to him. To the contrary, the testimony elicited at the hearing does not persuade this Court to make such a determination. First, one letter is clearly post-plea and thus, not relevant. Second, the credible testimony of DDA Galantino persuades the Court that the other three letters were provided during the pre-trial discovery phase in accordance with DDA Galantino's customary practice. Third, Attorney Much did acknowledge in writing receipt of at least one letter.

Notwithstanding the above, unknown evidence must not merely be a newly discovered or newly willing source for previously known facts. Both parties agree that Attorney Much and Appellant had at least one, more likely two and possibly all three letters from Keenan. All these letters set forth the same facts, i.e., that Keenan was expecting (whether he was promised it or not) something in exchange for his cooperation. If Appellant's objective, as implied herein, was to use this information to cross-examine Keenan and to undermine his credibility, Appellant had that information at the time he knowingly, intelligently and voluntarily entered into his plea agreement.

Furthermore, this information was not unfair surprise, as DDA Galantino made this known at the March 2, 2006 hearing, which was months before the plea agreement.

Appellant also fails to meet the threshold requirement of due diligence. Throughout the pre-litigation phase of this underlying case, Appellant time and again mentions his legal training because he attended one year of law school. Furthermore, as previously noted, it was Appellant's habit to interrupt and to interject himself into the hearings before the court. Appellant made it crystal clear on the record that he was also acting in his own interest, which was codified by Attorney Much at the PCRA hearing when he testified that Appellant was extremely active in his case, particularly in requesting discovery.

DDA Galantino testified that the Office of the District Attorney has an open-door policy regarding the contents of the criminal file; attorneys could stop in at any time and review the DA's file. Of paramount import, after the plea, when Appellant decided to represent himself for purposes of post-conviction relief, he could have requested documentation or availed himself of access to the DA's file well before the fifteen-year gap had been created.

## CONCLUSION

Prior to entering his plea, Appellant knew of Keenan's cooperation with the District Attorney, as such was stated on the record by DDA Galantino. Appellant was also cognizant of the District Attorney's position pertaining to Keenan's sentencing. Attorney Much unequivocally had, at the minimum, one Keenan letter. Furthermore, DDA Galantino was sure that he provided the three pre-plea letters from Keenan to Attorney Much. Therefore, Appellant's assertion that he would not have entered his plea had he known of Keenan's cooperation and expectations is without merit and should be rejected by the Superior Court.

Appellant also failed to exercise due diligence. Appellant represented himself at the outset of his PCRA petition and had access to the District Attorney's file. Even assuming arguendo that Appellant was unaware of the letters or the content therein, he could have readily accessed these had he simply requested to see the DA's file. He sat on his hands and now seeks to shift the burden to the Commonwealth in an attempt to eradicate his missteps and failures.

In summary, Appellant's PCRA Petition is untimely; DDA Galantino did provide the Keenan letters to Appellant prior to his plea; at the time he entered his plea, Appellant was fully cognizant of the very information he now claims would have caused him to reject the plea offer; and at all times Appellant failed to use due diligence.

This Court respectfully prays that the dismissal of Appellant's PCRA Petition be affirmed on appeal.

BY THE COURT:

_____
JOHN P. CAPUZZI, SR.,          J.